CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 01 2018

JULIA C. DUDLEY, CLERK
BY:
       DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| JASON ROYCE ALLEN, et al., ) <br> ) <br> Defendants-Appellants, ) <br> ) <br> v. ) <br> ) <br> JOHN P. FITZGERALD, Acting ) <br> Trustee for Region Four, ) <br> ) <br> Plaintiff-Appellee. ) <br> ) | Civil Action Nos. 7:18-cv-00134 <br> 5:18-cv-00057 <br><br> By: Hon. Michael F. Urbanski <br> Chief United States District Judge |

## MEMORANDUM OPINION

This matter comes before the court on the Defendant-Appellants Jason Royce Allen, Kevin Chern, Law Solutions Chicago, LLC ("Law Solutions"), and UpRight Law, LLC's ("UpRight," and collectively "Petitioners") Motion to Stay (the "Motion"), ECF No. 97. Previously, the court granted a partial temporary stay until July 2, 2018 so the parties could brief and the court could consider the underlying issues. Order, ECF No. 95. The Motion has now been fully briefed, and the court has considered the issues raised in the Motion. For the reasons discussed below, the court will **DENY** the Motion.

### I.   Procedural Background

On February 12, 2018, the bankruptcy court issued an Order (the "Order"), In re Williams, No. 16-07024 (Bankr. W.D. Va. Feb. 12, 2018), ECF No. 232, in favor of the U.S. Trustee for Region Four (the "Trustee") and against Petitioners.[1] At issue here, Paragraph 5

---

[1] Defendant-Appellants Darren T. Delafield, John C. Morgan, Jr., and Edmund Scanlan are not subject to the Privilege Revocation, and accordingly have not joined the Motion.

of the Order (the "Privilege Revocation") revoked the privileges of Petitioners to practice before the bankruptcy court for this District for five years. In particular, the Privilege Revocation provides:

> Pursuant to the relief requested in Williams Count VI and Scott Count V, the privileges of LSC, Upright Law, LLC, Kevin W. Chern, and Jason Royce Allen to file or conduct cases, directly or indirectly, in the Western District of Virginia are revoked for a period of five (5) years. This revocation shall include any firm that Law Solutions Chicago, Upright Law, Jason Allen or Kevin Chern, directly or indirectly, have an ownership interest in or control over.

Order ¶ 5. Simultaneously, the bankruptcy court issued a Memorandum Opinion setting forth findings of fact and explaining the legal rationale behind its Order. Memorandum Opinion ("Bankr. Op."), In re Williams, No. 16-50158 (Bankr. W.D. Va. Feb. 12, 2018), ECF No. 231.

Petitioners asked the bankruptcy court to alter the Privilege Revocation and stay its effectiveness until sixty days after the Order became final and nonappealable. Defs.' Mot. Alter Am. J. at 2, In re Williams, No. 16-07024 (Bankr. W.D. Va. Feb. 26, 2018), ECF No. 244. The bankruptcy court altered the Privilege Revocation so that it came into effect on May 9, 2018, and, until that date, barred Petitioners from taking on new clients, filing new cases, or charging currents for services related to transitioning those clients' cases. Order Disposing Defs.' Mot. Alter Am. J. at 2, In re Williams, No. 16-07024 (Bankr. W.D. Va. Mar. 12, 2018), ECF No. 250.

On March 27, Petitioners filed an appeal with this court. Bankr. Notice Appeal, ECF No. 1. Almost one month later, on April 20, 2018, Petitioners filed a motion to stay the Privilege Revocation with the bankruptcy court. Defs.' Mot. Limited Stay Enforcement

Bankr. Ct. Pending Appeal ("Motion to Stay Pending Appeal") at 1, In re Williams, No. 16-07024 (Bankr. W.D. Va. Apr. 20, 2018), ECF No. 264. On May 1, 2018, Petitioners filed an additional, emergency motion to stay with the bankruptcy court. Defs.' Emergency Mot. Stay J. Pending Decision Mot. Stay Pending Appeal at 1, In re Williams, No. 16-07024 (Bankr. W.D. Va. May 1, 2018), ECF No. 269. The bankruptcy court granted the emergency temporary stay. Order Granting in Part Defs.' Emergency Mot. Stay J. Pending Decision Mot. Stay Pending Appeal at 1, In re Williams, No. 16-07024 (Bankr. W.D. Va. May 3, 2018), ECF No. 271. Ultimately, however, the bankruptcy court denied the Motion to Stay Pending Appeal. Mem. Op. & Order Den. Defs.' Mot. Limited Stay Pending Appeal, In re Williams, No. 16-07024 (Bankr. W.D. Va. May 14, 2018) at 2, ECF No. 277.

The court held a motion hearing on May 18, 2018, during which Petitioners moved for another emergency stay of the Privilege Revocation pending appeal. Minute Entry, ECF No. 94. The court granted the emergency motion in part and stayed the Privilege Revocation until July 2, 2018. Order ("Emergency Stay Order"), ECF No. 95. Subsequently, on May 18, 2018, Petitioners filed the Motion presently before this court. On July 2, 2018, due to the volume of materials submitted during briefing on the Motion, the court entered an order further staying the Privilege Revocation until August 3, 2018, with the same terms as the Emergency Stay Order. Order, ECF No. 108.

## II. Standard of Review

The court is mindful that "a stay is an 'intrusion into the ordinary processes of administration and judicial review.'" Nken v. Holder, 556 U.S. 418, 427 (2009) (quoting Va. Petrol. Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam)). "A stay is

3

not a matter of right, even if irreparable injury might otherwise result." Id. at 433 (quoting Va. Ry. Co. v. United States, 272 U.S. 658, 672 (1926)). "Ordinarily, when a party seeking a stay makes application to an appellate judge following the denial of a similar motion by a trial judge, the burden of persuasion on the moving party is substantially greater than it was before the trial judge." Long v. Robinson, 432 F.2d 977, 979 (4th Cir. 1970).

The parties agree that the court must apply Hilton v. Braunskill, 481 U.S. 770 (1987), and examine four factors to determine if a stay is appropriate: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Id. at 776; see also Nken, 556 U.S. at 426 (citing Hilton, 481 U.S. at 776); Fitzgerald v. Alcorn, No. 5:17-cv-16, 2018 WL 709979, at *1 (W.D. Va. Feb. 5, 2018) (same).

The first two factors "are the most critical." Nken, 556 U.S. at 434. Moreover, the petitioner must show that "[m]ore than a mere possibility of relief is required." Id. (alteration in original) (internal quotations and citations omitted). Similarly, the petitioner must show more than "some 'possibility of irreparable injury.'" Id. at 434–35 (quoting Abbassi v. INS, 143 F.3d 513, 514 (9th Cir. 1998)). When the government is the respondent, the last two factors collapse into one. Id. at 435.

### III. Likelihood of Success on the Merits

The parties disagree over the appropriate legal genus to which the Privilege Revocation belongs. Petitioners insist that the Privilege Revocation is actually an injunction dressed in the language of bar admissions. See Mot. Petitioners Stay Pending Appeal ("Stay

4

Br."), ECF No. 97, at 21. Petitioners believe that when issuing the Privilege Revocation, the bankruptcy court failed to engage in the analysis attendant to injunctive relief. See id. at 21–22. By contrast, the Trustee argues that the bankruptcy court ordered the Privilege Revocation under its inherent authority to control membership of its bar. Opp. U.S. Trustee Petitioner's Mot. Stay Pending Appeal ("Stay Opp."), ECF No. 102, at 13.

The court concludes that the Trustee is correct and Petitioner's position rests on an untenable reading of the relevant case law. Accordingly, the court holds that the Privilege Revocation is, as a matter of law, not an injunction. Moreover, the court concludes that, given the factual record before it, the court cannot find that Petitioners have shown a strong likelihood of success on the merits necessary to satisfy factor one of Hilton.

### A. The Privilege Revocation Is Not an Injunction

It is axiomatic that courts "possess 'the inherent authority to disbar or suspend lawyers from practice.'" In re Comput. Dynamics, Inc., 253 B.R. 693, 698 (E.D. Va. 2000) (quoting In re Evans, 801 F.2d 703, 706 (4th Cir. 1986)), aff'd, 10 F. App'x 141 (4th Cir. 2001). "This authority is derived from the lawyer's role as an officer of the court." In re Evans, 801 F.3d 703, 706 (4th Cir. 1986), cert. denied, 480 U.S. 906 (1987). Courts bear "the responsibility to take action in order to protect the integrity of the [c]ourt, its bar, and the public from . . . misconduct." In re Ebel, 371 B.R. 866, 868 (Bankr. S.D. Ill. 2007). Recognizing this responsibility, "[i]t follows logically that a federal court's power to regulate and discipline attorneys appearing before it extends to conduct by nonlaywers amounting to practicing law without a license." United States v. Johnson, 327 F.3d 554, 560 (7th Cir. 2003), cert. denied, 540 U.S. 1111 (2004). Similarly, a court's inherent authority to regulate

5

the practice privileges of those who come before it is not cabined to attorneys. Instead, a court may sanction a law firm for the actions of its partners. See Enmon v. Prospect Capital Corp., 675 F.3d 138, 147–48 (2d Cir. 2012) (affirming sanctions where the partner's "actions were indistinguishable from those of Arnold & Itkin as a firm").

Petitioners reply on In re Bagdade, 334 F.3d 568 (7th Cir. 2003), for the proposition that the Privilege Revocation is an injunction. Bagdade, however, provides no support for their reliance. In Bagdade, the Seventh Circuit sanctioned an unregistered attorney for myriad violations. In a single parenthetical, the Seventh Circuit stated that the sanctions "have the status of an injunction, to the extent they require Bagdade to act in specific ways." Id. at 572. Bagdade levied seven different sanctions, many of which required Bagdade to act in specific ways, such as "notify[ing] any client he may have in any pending or impending appeal that he is not authorized to practice in this court" and "send[ing] copies of the opinion and appendices to every other court in which he has ever engaged in practice." Id. Of particular note, the sanctions provided that "Bagdade must not again attempt to practice law in this court without being admitted to its bar." Id.

Petitioners insist that this language in Bagdade "is substantially indistinguishable" from the language in the Privilege Revocation. Stay Br. 23. The court cannot agree. As a threshold matter, because the Seventh Circuit does not explain what it means by certain sanctions "having the status of an injunction," the court cannot be sure what exactly the Seventh Circuit intended—or if the Seventh Circuit intended that statement to apply to Bagdade's ability to practice law in front of that Circuit.

6

In any event, the language in Bagdade is easily distinguishable from the language in the Privilege Revocation, which in pertinent part reads: "[T]he privileges of LSC, Upright Law, LLC, Kevin W. Chern, and Jason Royce Allen to file or conduct cases, directly or indirectly, in the Western District of Virginia are revoked for a period of five (5) years." Order ¶ 5. Nothing in the Privilege Revocation requires Petitioners to act in any particular way. Instead, the Privilege Revocation merely revokes the practice privileges of Petitioners in this District. It is beyond reproach that the bankruptcy court has the inherent authority to regulate who may practice in front of it. See Comput. Dynamics, 253 B.R. at 698. Because the bankruptcy court controls who may appear in front of it, construing the Privilege Revocation as an injunction would essentially be construing the bankruptcy court as enjoining itself—a nonsensical outcome. See Teffeau v. Comm'r, 709 F. App'x 170, 173 (4th Cir. 2017) ("[A] court does not enjoin itself." (citing Penoro v. Rederi A/B Disa, 376 F.2d 125, 129 (2d Cir. 1967)).

Additionally, as Bagdade makes clear, a court "do[es] not have the authority to exclude [an attorney] from the bar of any other court other than [its] own." Bagdade, 334 F.3d at 572. To be sure, a court can, under certain circumstances, enjoin an attorney from filing certain cases in other courts. See Newby v. Enron Corp., 302 F.3d 295, 302–03 (5th Cir. 2002) (affirming injunction requiring attorney to seek permission from federal district court before filing any Enron-related suits in state court), reh'g denied, 48 F. App'x 919 (5th Cir. 2002), cert. denied sub nom., Fleming & Assocs., L.L.P. v. Fastow, 537 U.S. 1191 (2003). But enjoining an attorney from filing a case in any court is factually distinct from the

Privilege Revocation, which does not purport to enjoin Petitioners from representing clients in other jurisdictions.

Petitioners claim that the courts in Newby, 302 F.3d 295, and Federal Trade Commission v. Lanier Law, LLC, 194 F. Supp. 3d 1238 (M.D. Fla. 2016), "imposed a remedy similar to the one here—namely, barring a law firm from filing cases against a given defendant or in given areas of the law"—and explicitly recognized that the bar was an injunction. Stay Br. 25. Petitioners ignore that these cases enjoined attorneys or law firms from filing certain cases in all courts. See Newby, 302 F.3d at 300 (barring attorney from filing Enron-related cases in any court); Lanier Law, 194 F. Supp. 3d at 1288 (barring law firm and certain lawyers from "operating in the loan modification/foreclosure defense area").[2] The Privilege Revocation does not purport to limit Petitioners' ability to practice in other jurisdictions. Moreover, while the facts in Lanier Law bear more than a passing resemblance to the facts before his court, the Lanier Law court enjoined the law firm under the Federal Trade Commission Act, 15 U.S.C. § 45, not under its inherent powers to regulate those who practice before it. Accordingly, Newby and Lanier Law are irrelevant to the court's analysis.

Additionally, in their reply brief, Petitioners complain that the Trustee "fails to cite a single case where a court used its inherent authority to discipline a lawyer who was a stranger to its bar." Reply Supp. Mot. Petitioners Stay Pending Appeal, ECF No. 103, at 4. The

---

[2] The practice injunction in Lanier Law contained no geographic limitation:

> IT IS ORDERED that Defendants are permanently restrained and enjoined from advertising, marketing, promoting, offering for sale, or selling, or Assisting Others in the advertising, marketing, promoting, offering for sale, or selling, of any Secured or Unsecured Debt Relief Product or Service.

Final Order at 7, Federal Trade Commission v. Lanier Law, LLC, 3:14-cv-00786-MMH-PDB (M.D. Fla. Aug. 12, 2016), ECF No. 292. Nor does any other provision of the Lanier Law Final Order prescribe a geographic location.

8

Trustee did just that, however, citing United States v. Johnson for the proposition that "a court's power to regulate and discipline attorneys who appear before it extends to nonmembers of the bar who engage in unauthorized activities affecting the court." Stay Opp. 15 (citing Johnson, 327 F.3d at 560 & n.8). The court agrees with Johnson and the Trustee: "[A] federal court's power to regulate and discipline attorneys appearing before it extends to conduct by nonlawyers amounting to practicing law without a license." Johnson, 327 F.3d at 560. Johnson is especially relevant as Petitioners admit that the bankruptcy court found that Petitioners' nonattorney representatives engaged in the unauthorized practice of law. See Stay Br. 7–8.

Finally, Petitioners suggest the bankruptcy court lacked the authority to prohibit their constitutive law firms, rather than individual lawyers, from practicing in front of it. This suggestion is without support in the case law. Cf. Enmon, 675 F.3d at 147–48. Indeed, "[t]here is no serious dispute that a court may sanction a law firm pursuant to its inherent power." Id. at 147. Because UpRight ultimately oversaw both the unauthorized practice of law of its representatives and the Sperro Program, which the bankruptcy court described as a "scam from the start,"[3] Bankr. Op. 51, the bankruptcy court was well within its inherent authority when it extended the Practice Revocation to UpRight and Law Solutions. Cf. Enmon, 675 F.3d at 147.

---

[3] The court refers to the Memorandum Opinion for a full description of the Sperro Program. See Bankr. Op. 16–21. For present purposes, it shall suffice that the bankruptcy court found that the Sperro Program was a scam program under which UpRight clients would surrender cars in bankruptcy to companies operated by nonparty Brian Fenner. Id. at 16–17. The Fenner entities would tow cars out of certain states, including Virginia, "to Fenner-related storage lots in Nevada, Mississippi, or Indiana for the purpose of trying to prime secured lenders, or hold their collateral hostage, with excessive hookup, towing and storage fees that were completely unnecessary." Id. at 20. In return the Fenner entities would pay UpRight's "clients' attorneys fees and filing fees in order to get the referral from [UpRight] to do it." Id.

9

In sum, after examining both the text of the Privilege Revocation and the relevant case law, the court finds that the Privilege Revocation, as a matter of law, is not an injunction. Moreover, the bankruptcy court had the inherent authority to prohibit Petitioners—including any nonlawyers and law firms—from practicing in front of it.

**B.    Petitioners Have Not Shown a Strong Likelihood of Success on the Merits**

While the court has concluded the Privilege Revocation is not an injunction, that conclusion does not answer the ultimate question: Have Petitioners made a strong showing that they are likely to succeed on the merits? Hilton, 481 U.S. at 776. Petitioners' briefs are of little help, as their arguments presuppose that the Privilege Revocation is an injunction.[4]

The court is cognizant that it "owe[s] substantial deference" to the bankruptcy court's decision to issue the Privilege Revocation. Evans, 801 F.3d at 706. The court is also cognizant that the imposition of the Privilege Revocation "is subject to procedural due process requirements, including notice and an opportunity to be heard." Comput. Dynamics, 253 B.R. at 699. The record betrays any suggestion that due process was not satisfied, however. Petitioners confirm that the Trustee asked for a privilege revocation in its complaint. Stay Br. 2. Further, Petitioners admit the bankruptcy court issued the Privilege Revocation "[f]ollowing a four-day trial and extensive post-trial briefing by both parties." Id.

---

[4] For instance, Petitioners rely heavily on In re Stewart, 647 F.3d 553 (5th Cir. 2011), for the proposition that a "bankruptcy court lacked jurisdiction to enter an injunction directed at Wells Fargo 'rang[ing] far beyond the dimensions' of Stewart's case, 'to police a range of cases untested here by the adversary process.'" Stay Br. 32 (alteration in original) (quoting Stewart, 647 F.3d at 558). The district court issued an injunction requiring Wells Fargo to audit every proof of claim it filed in that district. Stewart, 647 F.3d at 556. While it is true the Fifth Circuit held that the injunction "does not follow from 'the inherent power of the court to protect its jurisdiction and judgments and to control its docket,'" id. at 557 (quoting Farguson v. MBank Houston, N.A., 808 F.2d 358, 360 (5th Cir. 1986)), the Fifth Circuit had already held that the Wells Fargo injunction was, in fact, an injunction. The Privilege Revocation is not an injunction, and Stewart is therefore not relevant. Cf. Official Transcript of Proceedings, Law Sols. Chi. L L C v. Trustee, 5:18-cv-00216-EEF-MLH (W.D. La. Mar. 22, 2018), ECF No. 27 (holding, in a motion to stay a privilege revocation brought by one of the present Petitioners, that "Stewart is distinguishable from the instant case" because "Stewart targeted the actions of Wells Fargo, a creditor, as opposed to attorneys practicing before it").

10

Nor, on the factual record of Petitioners' conduct, can the court conclude Petitioners have made a strong showing that the court will reverse the Privilege Revocation on appeal. Petitioners gloss over damning factual findings of the bankruptcy court. The bankruptcy court found Petitioners engaged in high-pressure, unethical sales tactics to coerce potential clients into retaining Petitioners, including preying off of client's religious beliefs and ignoring spousal input. Bankr. Op. 6.

For instance, when a potential client tells on onboarding representative that "I need to pray about it," the representative is trained to respond:

> I appreciate that. I pray about every decision I make myself. How are you most comfortable paying? Let's pray together. I trust God won't mislead either of us. I am willing to accept God's will for the both of us.

Id. at 6 (citation omitted). And when a potential client tells a representative that "I need to talk with my Wife/Husband," the representative is trained to respond with:

> I agree, and you should, but if your husband/wife is anything like mine, he/she never tells me no when I really need or love something, and I never tell him/her no.

Or:

> [B]etter to ask forgiveness than ask for permission, so let's get you going right away[.]

Id. (last alteration in original). Moreover, as Petitioners admit, the bankruptcy court found numerous instances where Petitioners' nonattorney representatives engaged in the unauthorized practice of law. Id. at 7–8; see also Stay Br. 7–8.

Finally, Petitioners ignore wholesale their litigation misconduct. The bankruptcy court found Petitioners "used heavy handed tactics, including text messages, to try and get [debtor-clients in the underlying bankruptcy proceeding] to sign conflict waivers" and

11

suggested that the clients' "discharge might be at issue" if they did not kowtow to Petitioners' request. Bankr. Op. 30–31. Petitioners wanted the debtor-clients to sign a conflict waiver so they "could assert the attorney-client privilege on their behalf and attempt to shield their files and [UpRight's] from discovery." Id. at 31.

Given the facts as found by the bankruptcy court, which Petitioners in substantial part do not appear to contest, the court cannot conclude that the Privilege Revocation was unfounded. Indeed, given the facts before the court and the fact that the Privilege Revocation is not an injunction, the court at present cannot conclude that Petitioners have any likelihood of success on the merits.

## IV. Irreparable Harm

Petitioners claim two distinct irreparable harms: (1) Petitioners must refund and forego attorneys' fees from existing clients; and (2) Petitioners will suffer incalculable loss of business due to reputational harm. Neither suffices to establish irreparable harm under Hilton.

Initially, the court notes that a stay "is not a matter of right even if irreparable injury might otherwise result to the" Petitioners, as "[t]he parties and the public . . . are also entitled to the prompt execution of orders that the legislature has made final." Nken, 556 U.S. at 427 (internal quotations and citations omitted). Because the court has already found that Petitioners have not established a strong likelihood of success on the merits, Petitioners must make "a strong showing of probable irreparable injury." James A. Merritt & Sons v. Marsh, 791 F.2d 328, 331 (4th Cir. 1986) (citing N.C. State Ports Auth. v. Dart Containerline Co., 592 F.2d 749, 750 (4th Cir. 1979)).

12

When a petitioner's harm "may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." Cont'l Sec. Corp. v. Shenandoah Nursing Home P'ship, 188 B.R. 205, 209 (W.D. Va. 1995) (quoting Hughes Network Sys., Inc. v. Interdigital Commc'ns Corp., 17 F.3d 691, 694 (4th Cir. 1994)). Under this standard, courts generally have found "two limited circumstances" in bankruptcy appeals "that constitute irreparable harm": (1) "where the moving party's business cannot survive without a [stay] or where damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected"; and (2) "when the failure to grant relief creates a permanent loss of customers to a competitor or the loss of goodwill." BDC Capital, Inc. v. Thoburn Ltd. P'ship, 508 B.R. 633, 639 (E.D. Va. 2014) (alteration in original) (internal quotations omitted) (quoting Cont'l Sec., 188 B.R. at 209). Further, the petitioner bears the burden of producing evidence to support a claim of irreparable harm. See Merritt & Sons, 791 F.2d at 331 n.4.

Petitioners' putative irreparable harms do not satisfy this standard. While Petitioners allege that they will be forced to repay up to $450,000 in attorneys' fees, Stay Br. 44; Decl. Ryan M. Galloway Supp. Defs.' Mot. Limited Stay Bankr. Ct. Order Pending Appeal ("Galloway Decl.") ¶ 9, ECF No. 97-12, there is no suggestion that Petitioners' business will collapse because of the repayment of attorneys' fees from this district. Cf. BDC Capital, 508 B.R. at 639. Instead, Petitioners will merely lose out on business (in the form of attorneys' fees) in this district during the pendency of the Privilege Revocation. That is not irreparable harm. Cf. Merritt & Sons, 791 F.2d at 331 ("While Merritt may lose the opportunity to bid on an undetermined number of military contracts during the suspension period, we cannot

13

agree with the district court that this loss constitutes irreparable harm."); Official Transcript at 64 ("Law Solutions Hearing" or "Law Sols. Tr."), Law Sols. Chi. L L C v. Trustee, 5:18-cv-00216-EEF-MLH (W.D. La. Mar. 22, 2018), ECF No. 27 (holding, under almost identical circumstances, that it "d[id] not view the monetary loss [from a privilege revocation] as sufficiently burdensome to warrant a stay").

Nor does Petitioners' claimed reputational harm satisfy the standard. On the one hand, if the court ultimately affirms the bankruptcy court, any reputational harm is an injury of Petitioners' own making and cannot justify a finding of irreparable harm. See Long, 432 F.2d at 981. On the other hand, if the court ultimately reverses the bankruptcy court, any reputational harm will be cured. See Sampson v. Murray, 415 U.S. 61, 91 (1974) (holding that whatever reputational harm that "might occur would be fully corrected" by reversal on administrative appeal); Law Sols. Tr. at 64 (holding, under almost identical circumstances, that any reputational harm from a privilege revocation would be cured by reversal of that revocation). Further, while Petitioners aver that "new and existing clients in many different jurisdictions have expressed concern about" the Privilege Revocation, Galloway Decl. ¶ 13, Petitioners fail to produce any evidence suggesting that the Privilege Revocation would effect "a permanent loss of customers to a competitor or the loss of goodwill." BDC Capital, 508 B.R. at 639.

Petitioners urge the court to follow what it claims to be the court's analysis from the Law Solutions Hearing. The Law Solutions Hearing involved UpRight Law and Law Solutions—two of the Petitioners in the instant case—seeking a stay of a practice revocation. Petitioners assert that the district court, on an appeal from a privilege revocation

14

issued on a very similarly factual and procedural basis as here, held that "the monetary harm and temporary suspension of the firm from filing cases for a period of 90 days constituted an irreparable injury." Stay Br. 46.

Petitioners' interpretation of the Law Solutions Hearing is disingenuous. First, while the court "agree[d] with UpRight that the 90-day suspension . . . is the only portion of the Order that could result in irreparable harm," the court did "not find this element weighs heavily in favor of UpRight." Law Sols. Tr. 63–64 (emphasis added). Moreover, the court noted that the reputational injury was "temporary" because the privilege revocation was temporary and because UpRight could ultimately win the appeal and vindicate itself. Id. at 64. Accordingly, the court found that "while UpRight is likely to suffer some irreparable harm, this factor does not weigh heavily in favor of UpRight." Id. at 65. Because UpRight failed to satisfy the other three factors—like this court, the Law Solutions court found that UpRight did not show a strong likelihood of success on the merits—the court denied the stay. Id. at 65–68.

The court holds that the monetary damages Petitioners may incur as a result of refunding attorneys' fees do not constitute irreparable harm. Moreover, while there may be slight irreparable harm to Petitioners' reputation, it could be cured if the court ultimately rules in Petitioners' favor and vacates the Practice Revocation. Accordingly, Petitioners have failed to satisfy the second Hilton factor.

15

## V. Conclusion

Because Petitioners have failed to satisfy the first and second <u>Hilton</u> factors, Petitioners have failed to meet the burden required for this court to issue a stay.[5] Accordingly, Petitioners' Motion to Stay will be **DENIED**.

Entered: July 31, 2018

/s/ Michael F. Urbanski
Michael F. Urbanski
Chief United States District Judge

---

[5] Because the court finds that Petitioners have failed to satisfy the first two factors, it does not analyze the third and fourth factors. See <u>Nken</u>, 556 U.S. at 434 (noting that the first two elements are the most important, and a petitioner must establish more than a mere possibility of success on the merits or irreparable harm to justify a stay).