CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 11 2019

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

JASON ROYCE ALLEN, et al., )
)
    Defendants-Appellant, )    Civil Action No.   7:18-cv-00134
)                        5:18-cv-00057
v. )
)
JOHN P. FITZGERALD, )
Acting Trustee for Region Four, )
)
)     By: Hon. Michael F. Urbanski
)     Chief United States District Judge
    Plaintiff-Appellee. )
)

## MEMORANDUM OPINION

This is an appeal of an order by the United States Bankruptcy Court for the Western

District of Virginia pursuant to 28 U.S.C. § 158(a)(1) and Fed. R. Bankr. P. 8001. On February

12, 2018, the bankruptcy court entered an order and memorandum opinion resolving the

adversary proceeding and on March 12, 2018, the bankruptcy court granted appellants' motion

to amend the bankruptcy court order. On March 26, 2018, appellants filed an amended notice

of appeal of the bankruptcy court's February 12, 2018 order, as amended. For the reasons that

follow, this court **AFFIRMS** the bankruptcy court's February 12, 2018 order in part as it

relates to the practice revocation imposed against appellants Kevin Chern, Jason Allen, and

Law Solutions Chicago, LLC, d/b/a Upright Law, LLC ("LSC") and the practice revocation

and monetary sanctions imposed individually against appellants Darren Delafield and John C.

Morgan, Jr., **REMANDS** in part to the bankruptcy court for consideration of the ability of

Chern, Allen, and LSC to pay the monetary sanctions imposed against them, and **VACATES**

the bankruptcy court's order in part as it pertains to the monetary sanction imposed against appellant Edmund Scanlan.

I.

This case concerns the power of the United States Bankruptcy Court for the Western District of Virginia to impose practice and monetary sanctions for conduct it found to be in bad faith in connection with two consumer bankruptcy cases in this district. The case involved LSC, an Illinois consumer bankruptcy law firm that operates on a national basis, affiliating with local bankruptcy attorneys. Allen and Chern are members of LSC, with Chern serving as its managing partner and Allen its chief operating officer. Scanlan, not a lawyer, is LSC's executive director. Delafield and Morgan are Virginia lawyers who, in association with LSC, represented Timothy and Adrian Williams and Jessica Scott, in their Chapter 7 bankruptcy cases in this district.

After a four-day trial, the bankruptcy court found that LSC's hard-sell marketing practices and involvement in a scheme, known as the Sperro Program, which operated to undermine the secured position of vehicle finance companies, was in bad faith. The bankruptcy court imposed practice and monetary sanctions on the appellants. The bankruptcy court concluded:

> Considering (1) the hard sell tactics encouraged on its sales people, (2) the transcripts of the actual recordings of the calls with clients, (3) the lack of supervision and control over its salespeople in connection with the unauthorized practice of law, due in no small part to the commission and sales structure imposed upon them, (4) the focus on cash flow over professional responsibility, and (5) the participation in the Sperro Program and the record as a whole, including Upright's efforts to get the Williamses and Scott to assert the attorney-client privilege in a thinly-veiled attempt to cover its own tracks, this Court believes

2

that the Upright Defendants have acted in bad faith and the privileges of LSC, Upright Law, Chern, and Allen to file or conduct cases, directly or indirectly, in the Western District of Virginia shall be revoked for a period of five (5) years. This includes any firm that LSC, Upright Law, Allen, or Chern, directly or indirectly, have an ownership interest in or control over. Further, LSC, Upright, Chern, Allen, Scanlan and Sperro shall be fined collectively the sum of $250,000.00. Chern shall be separately and personally fined the sum of $50,000.00 for his participation in and leadership of the Sperro scheme. Given LSC's financial resources and revenues in particular, as reflected by its tax returns and evidence of receipts from residence of the Western District of Virginia, these sums are appropriate in an effort to deter future misconduct. A lesser sanction would not be more appropriate.

Bankruptcy Opinion ("Bankr. Op."), ECF No. 75, at 506–07.

The bankruptcy court also sanctioned Delafield and Morgan, the Virginia lawyers, for their individual failings. Delafield's privilege to practice in this district was revoked for one (1) year and he was sanctioned $5,000, to be paid to the Williamses. Morgan received an eighteen (18) month revocation and was sanctioned $5,000, payable to his client, Ms. Scott.

Appellants filed this appeal contending that the bankruptcy court lacked the authority to impose the practice and monetary sanctions. First, appellants argue that the practice revocation is an injunction as to which the bankruptcy court lacked jurisdiction. Second, they argue that the monetary sanctions were imposed in violation of due process as they were excessive, and appellants had no opportunity to present evidence of their ability to pay. Third, appellants argue that the United States Bankruptcy Trustee waived the ability to defend any monetary sanction above $5,000.00. Fourth, appellants contend that the bankruptcy court exceeded its statutory and inherent powers in imposing the monetary sanctions without specifying the future misconduct to be deterred. Fifth, appellants argue Chern, Allen and

Scanlan were not subject to sanctions as they had no role in the Williams and Scott bankruptcy cases. Sixth, appellants argue that the bankruptcy court abused its discretion by sanctioning the Virginia lawyers. Seventh, appellants argue that the monetary sanctions imposed on Scanlan should be vacated for lack of evidence. These arguments will be addressed in turn.[1]

## II.

District courts have jurisdiction to hear appeals from final judgments and orders of the bankruptcy courts. See 28 U.S.C. § 158(a). The district court reviews "[f]indings of fact by the bankruptcy court . . . only for clear error and legal questions are subject to de novo review." See In re Johnson, 960 F.2d 396, 399 (4th Cir. 1992); see also In re Dillon, 189 B.R. 382, 384 (W.D. Va. 1995).[2] The district court "will not reverse the trial court's finding of fact that has support in the evidence unless that finding is clearly wrong." In re ESA Envtl. Specialists, Inc., 709 F.3d 388, 399 (4th Cir. 2013). The district court may only consider evidence presented to the bankruptcy court and made part of the record. See In re Dillon, 189 B.R. at 384; In re Computer Dynamics, Inc., 253 B.R. 693, 698 (E.D. Va. 2000).

The question before the court is whether the bankruptcy court erred in imposing sanctions on appellants pursuant to its inherent power and Bankruptcy Code § 105(a). Appellants assert that the bankruptcy court did not have the authority to impose the practice revocations or monetary sanctions in this case. The court concludes that the bankruptcy court did have the authority to impose the practice revocation sanctions pursuant to its inherent

---

[1] The facts are addressed in great detail in the bankruptcy court's memorandum opinion and will not be restated here, except where pertinent to the issues on appeal.

[2] Unless otherwise noted, the court has omitted internal citations.

authority and the authority to impose monetary sanctions pursuant to its inherent authority augmented by Section 105(a). However, the court finds that the bankruptcy court erred by not permitting appellants Chern, Allen, and LSC to present evidence regarding their ability to pay the sanctions and by sanctioning Scanlan, a non-lawyer, who was not involved in the underlying bankruptcy cases.

"Federal courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Goodyear Tire & Rubber Co. v. Haeger, —— U.S. ——, 137 S.Ct. 1178, 1186 (2017). As such, "[a] federal court also possesses the inherent power to regulate litigants' behavior and to sanction a litigant for bad-faith conduct." In re Weiss, 111 F.3d 1159, 1171 (4th Cir. 1997) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43–44 (1991)). Further, "[a] court has the inherent authority to disbar or suspend lawyers from practice." In re Evans, 801 F.2d 703, 706 (4th Cir. 1986). This inherent power to sanction litigants for bad-faith conduct applies to bankruptcy courts, in addition to Article III courts. See In re Weiss, 111 F.3d at 1171–72 (recognizing the sanctioning power in Chambers applies to a bankruptcy court); see also In re Bowman, Case No. 08-cv-339, 2010 WL 2521441, at *6 (W.D. Va. June 21, 2010) (affirming bankruptcy court order sanctioning attorney based on its inherent authority); In re Heck's Properties, Inc., 151 B.R. 739, 765 (S.D.W. Va. 1992) ("It is well-recognized . . . that [bankruptcy] courts have the inherent authority to impose sanctions upon counsel who [are] found to have acted in bad faith, vexatiously, wantonly or for oppressive reasons"). A court can sanction a party based on its inherent power in conjunction with, or instead of, other sanctioning statutes or rules. In re Weiss, 111 F.3d at 1171; see also Chambers, 501 U.S. at 50

("But neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules").

Furthermore, bankruptcy courts may take any action or make any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process. 11 U.S.C. § 105(a). Section 105(a) provides bankruptcy courts with the authority to hold parties or attorneys in civil contempt. See In re Walters, 868 F.2d 665, 669 (4th Cir. 1989); In re Skinner, 917 F.2d 444, 447 (10th Cir. 1990) (holding that "Section 105(a) empowers bankruptcy courts to enter civil contempt orders"). Pursuant to the authority to enter civil contempt orders, bankruptcy courts can "suspend an attorney from the practice of law," In re Computer Dynamics, 253 B.R. at 699, and "enter monetary sanctions [] for civil contempt." In re Skinner, 917 F.2d at 448. However, the imposition of sanctions is subject to procedural due process requirements. See, e.g., In re Ruffalo, 390 U.S. 544, 550 (1968) (holding that an attorney subject to discipline is entitled to procedural due process); In re Computer Dynamics, 253 B.R. at 699.

Pursuant to either its inherent power or Section 105(a), this court "review[s] for abuse of discretion a [bankruptcy] court's award of sanctions." Six v. Generations Fed. Credit Union, 891 F.3d 508, 518–19 (4th Cir. 2018). "A [trial] court abuses its discretion where it has acted arbitrarily or irrationally, has failed to consider judicially recognized factors constraining its exercise of discretion, or when it has relied on erroneous factual or legal premises." United States v. Welsh, 879 F.3d 530, 536 (4th Cir. 2018). "Unless the sanctioning court has acted

contrary to the law or reached an unreasonable result, we will affirm the sanctions decision."
In re Rimsat, Ltd., 212 F.3d 1039, 1046 (7th Cir. 2000).

The court will first examine the sanctions as they apply to the non-Virginia attorneys, Chern, Allen, and LSC. The court will then turn to the sanctions as they apply to the Virginia attorneys, Delafield and Morgan. Finally, the court will review the sanctions as they apply to non-attorney Scanlan.

## III.

The bankruptcy court imposed both practice and monetary sanctions against the non-Virginia attorneys, Chern, Allen, and LSC.[3] First, appellants question whether the bankruptcy court had the authority, either inherent or statutorily, to impose the practice revocation on attorneys that did not appear in the Western District of Virginia. Second, appellants assert that the bankruptcy court erred in imposing the monetary sanctions.

a.  Practice Revocation

A court has the inherent authority to disbar or suspend lawyers from practice as a sanction. See In re Snyder, 472 U.S. 634, 643 (1985); see also In re Evans, 801 F.2d at 706. This authority is derived from the lawyer's role as an officer of the court. Id. at 643. The Supreme Court has stated that great discretion must be given to the trial court on decisions to suspend or disbar an attorney:

> On one hand, the profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend on its exercise. The right to exercise it ought not to be lightly or

---

[3] The court treats Chern and Allen, as well as the law firm LSC, as the non-Virginia attorneys. See Enmon v. Prospect Capital Corp., 675 F.3d 138, 147 (2d Cir. 2012) ("[t]here is no serious dispute that a court may sanction a law firm pursuant to its inherent power"). Accordingly, the analysis remains the same for the two attorneys and the law firm.

> capriciously taken from him. On the other, it is extremely
> desirable that the respectability of the bar should be maintained,
> and that its harmony with the bench should be preserved. For
> these objects, some controlling power, some discretion, ought to
> reside in the court. This discretion ought to be exercised with
> great moderation and judgment; but it must be exercised; and no
> other tribunal can decide, in a case of removal from the bar, with
> the same means of information as the court itself.

Ex parte Burr, 22 U.S. 529, 529–30 (1824); see also In re G.L.S.,745 F.2d 856 (4th Cir. 1984)

(courts "have the authority to decide, within the bounds of due process, who will be admitted

to practice"). An appellate court owes "substantial deference to the [trial] court" in reviewing

a decision to disbar or suspend an attorney. In re Evans, 801 F.2d at 706; see also In re

Morrissey, 305 F.3d 211, 217 (4th Cir. 2002) (affirming disbarment of attorney and noting the

"great deference a reviewing court is directed to show to the court which imposes the

disbarment").

The inherent power to disbar an attorney must be exercised with great caution. Byrd v.

Hopson, 108 F. App'x 749, 756 (4th Cir. 2004) (unpublished). The extreme sanction of

disbarment or suspension "must be exercised with the greatest restraint and caution, and then

only to the extent necessary," based on the record before the court. United States v. Shaffer

Equip. Co., 11 F.3d 450, 461 (4th Cir. 1993); see also Resolution Tr. Corp. v. Bright, 6 F.3d

336, 340 (5th Cir. 1993). Attorneys facing practice suspension are guaranteed the right to fair

notice, but not necessarily the right to a hearing. In re Chipley, 448 F.2d 1234, 1235 (4th Cir.

1971) ("Procedural due process in a disbarment proceeding does not require that a hearing be

given to the attorney involved, but he must be given fair notice of the charge against him and

an opportunity to explain and defend his actions").

Here, the bankruptcy court invoked its inherent authority and revoked the practice privileges of Chern, Allen, and LSC.[4] Appellants argue that the bankruptcy court lacked authority to sanction Chern, Allen, and LSC because the misconduct that the bankruptcy court found did not occur in the underlying proceedings sub judice. For the reasons stated below, the court concludes that bankruptcy court did not abuse its discretion in imposing the practice revocation as to Chern, Allen, or LSC.[5]

### 1. The Unauthorized Practice of Law

It is uncontested that Chern, Allen, and LSC did not appear before the bankruptcy court and appellants argue that the authority to suspend or revoke practice privileges only applies to attorneys that are practicing before the court. The court disagrees. As the court held in the August 1, 2018 memorandum opinion, it agrees with the holding of United States v. Johnson, 327 F.3d 554, 560 (7th Cir. 2003). In Johnson, the Seventh Circuit found that "a court's power to regulate and discipline attorneys who appear before it extends to nonmembers of the bar who engage in unauthorized activities affecting the court." Id.

---

[4] The court notes that in another case filed against LSC, the Northern District of Alabama affirmed a bankruptcy court's decision to "rely upon its inherent authority to impose non-monetary sanctions," including an 18-month practice revocation, against LSC as a result of a finding of bad faith conduct. Law Sols. of Chicago LLC v. Corbett, Case No. 18-cv-677, 2019 WL 1125568, at *3 (N.D. Ala. Mar. 12, 2019).

[5] As a preliminary matter, the court has already determined that appellants' argument that the practice revocation is an injunction disguised as a practice suspension fails. Chern, Allen, and LSC contend that the practice revocation was an impermissible injunction entered in a case lacking justiciability. The court addressed this very question in a memorandum opinion filed on August 1, 2018. ECF No. 112. Therein, the court held "that the Practice Revocation is, as a matter of law, not an injunction." The court need not restate its reasoning here and adopts entirely its opinion from the August 1, 2018 memorandum opinion. Accordingly, the practice revocation is not an injunction and the court finds that the bankruptcy court had jurisdiction to impose the practice revocation. See also Matter of Banks, 770 F.App'x 168, 168–69 (5th Cir. 2019), aff'g Law Sols. Chicago LLC v. United States Tr., 592 B.R. 624, 630 (W.D. La. 2018) (adopting district court's opinion affirming bankruptcy court's practice revocation, finding that a "court does not necessarily issue an 'injunction' when it restricts an attorney's ability to practice within its district, or regulate that practice").

Likewise, under Virginia law, lawyers are responsible for the unauthorized practice of law of their non-lawyer employees. Pt. 6, § I, Rules of Supreme Ct. of Va.[6] Here, the bankruptcy court found that the non-lawyer employees of LSC were consistently engaged in the unauthorized practice of law affecting the bankruptcy court. See Bankr. Op. 459–60, 506–07.

Chern and Allen, as managing partners of LSC, oversaw this unauthorized practice of law that was fueled by LSC's high-pressure sales environment. The LSC sales staff, known as "client consultants," "engaged in numerous instances of providing impermissible legal advice to potential clients, albeit alleged violations of [LSC's] policies, and some of it was just outright wrong, such as advising clients to hide collateral or leave certain debts off their schedules." Id. at 510. The bankruptcy court found that "[c]oupled with the pressure to hit sales and commission targets, the fact that sales people engaged in overreaching conduct is not surprising" and "[t]he sampling of the client consultants' actions in this case, combined with evidence as a whole, was enough to satisfy the [bankruptcy court] that [LSC] has serious oversight issues." Id. at 510–11, n. 81.

Allen also created and implemented the "Sales Play Book" that encouraged client consultants to "compete against other lawyers for the representation of the clients." Id. at 503, n. 66. The Sales Play Book was "replete with high pressure sales tactics" that made the bankruptcy court determine that LSC was more concerned with closing the sale than representing their clients. Id. at 458. The bankruptcy court was especially troubled by the "now or never" pitch, that included a time sensitive offer to potential debtors and included scripted

---

[6] Pt. 6, § I, Rules of Supreme Ct. of Va. provides, in pertinent part: "Any lawyer who aids a non-lawyer in the unauthorized practice of law is subject to discipline and disbarment."

language such as it is "better to ask for forgiveness than ask for permission," when a prospective client said they needed time to discuss the bankruptcy filing with their spouse. Id. While client consultants were instructed that they could not provide legal advice, "in several instances in the matters before the [bankruptcy court], those instructions were not followed by [LSC] non-attorney personnel." Id. at 459. Further, client consultants were paid a base salary of $40,000, plus a commission tied to how many prospects they closed. Id.

Here, the client consultants were involved directly with the debtors in the underlying cases and engaged in the unauthorized practice of law within this district. For example, a non-lawyer client consultant located in Chicago gave Ms. Scott the legal advice that she could leave a debt off her bankruptcy schedule. Id. at 460, n. 12. As such, under Virginia law, Chern and Allen are responsible for the unauthorized practice of law conducted by their subordinates because they aided them by training the employees and implementing the Sales Play Book in the unauthorized practice of law. Pt. 6, § I, Rules of Supreme Ct. of Va. Even though Chern and Allen are non-members of the Western District of Virginia bar, their failure to properly supervise their employees, which led to the unauthorized practice of law in this district, had an impact on the bankruptcy court and the underlying proceedings.

### 2. The Sperro Program

The bankruptcy court found that the Sperro Program was a "scam from the start" and held Chern responsible for its creation and implementation. Bankr. Op. 503, 506. The Sperro Program involved LSC clients surrendering their financed cars to companies operated by nonparty Brian Fenner. The Fenner entities would tow cars out of certain states, including Virginia, "to Fenner-related storage lots in Nevada, Mississippi, or Indiana for the purpose of

trying to prime secured lenders, or hold their collateral hostage, with excessive hookup, towing and storage fees that were completely unnecessary." Id. at 468–73. In return the Fenner entities would pay LSC's "clients' attorney's fees and filing fees in order to get the referral from [LSC] to do it." Id. at 472.

From the moment Chern emailed the LSC partners regarding the Sperro program, he was alerted to the questionable nature of the business arrangement. Id. at 472. To further evidence this misconduct, potential debtors, including the Williamses, were offered the Sperro program by LSC's client consultants before the debtor consulted with an attorney. Id. at 472, 504.[7]

The bankruptcy court laid out a detailed factual finding regarding the creation of the Sperro program. See Bankr. Op. 468–78. In essence, Chern created the program to increase the speed and likelihood of receipt of attorney fees. Id. at 503. The bankruptcy court's finding that the Sperro program was created and implemented in bad faith is amply supported by the record and is not clearly wrong. Id. at 507.

### 3. Litigation Misconduct

Chern, Allen, and LSC also engaged in litigation misconduct when appellants "used heavy handed tactics, including text messages, to try and get [Scott and the Williamses] to sign conflict waivers" to allow the appellants to "assert the attorney-client privilege on their behalf and attempt to shield their files and [LSC's] from discovery." Id. at 482–83.

Appellants spill significant ink in their reply brief, ECF No. 120, arguing that the bankruptcy court's finding was clearly erroneous that LSC engaged in bad-faith conduct by

---

[7] Such conduct is also further evidence of the unauthorized practice of law.

attempting to get the Williamses and Scott to assert the attorney-client privilege in an attempt to avoid the United States Trustee's subpoenas. Bankr. Op. 54. The court disagrees. After reviewing the record, the court finds that there is sufficient evidence, including evidence of many emails, text messages, and phone calls from LSC to the Williamses regarding the subpoenas, to support the bankruptcy court's finding that LSC's actions were done in bad faith. Furthermore, in an attempt to obfuscate LSC's conduct, appellants argue that LSC's communications with the Williamses had a sense of urgency because LSC asked an in-house lawyer "to help Williams *two days* before the Williamses' responses were due." Defs.' Reply Br. 10 (emphasis in original). Any such delay in LSC retaining an in-house lawyer to assist with the subpoena response was of the appellants' own doing as there is no claim that the subpoenas were served or filed late. Finally, appellants' reply brief fails to present any evidence as to why LSC's interactions with Ms. Scott pertaining to her subpoena were appropriate. Accordingly, the court affirms the bankruptcy court's finding of fact that LSC's attempts to get the Williamses and Scott to sign the waiver of potential conflict was inappropriate and grounds for sanctions.

4.  <u>Connections to the Western District of Virginia</u>

Chern, Allen, and LSC were otherwise involved both with the underlying bankruptcy cases of Scott and the Williamses, along with numerous other cases in the Western District of Virginia. Based on LSC's hard-sell tactics and Sales Play Book, it entered into attorney-client relationships with multiple residents of the Western District of Virginia, earning $821,156.52 in attorney's fees. Bankr. Op. 467. Of that, roughly half of the fees, or $409,650.22, were for cases where they actually filed bankruptcy petitions. <u>Id.</u> Prior to September 2015, an LSC

"team of document collectors" would "interface with the client and collect all of the documents remotely [and] an associate attorney on staff in Chicago would prepare an initial draft of the petition and do an initial Skype interview with the client.[8] Id. at 462. Therefore, at least some of the fees retained for unfiled legal work must have been earned by attorneys working outside of this district. Chern further testified that the Rule 2016(b) disclosures "were and still are prepared in Chicago." Bankr. Op. 497. Mr. Williams also spoke with multiple non-Virginia licensed attorneys, about various issues, including the legality of the Sperro program. Id. at 475. In the end, the record is clear that legal work was conducted by LSC attorneys who were outside of the Western District of Virginia for clients in this district and LSC client consultants, also located outside of this district, initiated the attorney-client relationship with clients in this district. This sufficiently establishes a nexus between Chern, Allen, and LSC and the cases pending in this district.

Finally, appellants' argument that Chern, Allen, and LSC are beyond the reach of the court's inherent authority because they did not appear before the court mistakenly relies on the wrong definition of what constitutes the practice of law. The Rules of the Supreme Court of Virginia state:

> A person or entity engages in the practice of law when representing to another, by words or conduct, that one is authorized to do any of the following: (a) Undertake for compensation, direct or indirect, to give advice or counsel to an entity or person in any matter involving the application of legal principles to facts. (b) Select, draft or complete legal documents or agreements which affect the legal rights of an entity or person. (c) Represent another entity or person before a tribunal. (d) Negotiate the legal rights or responsibilities on behalf of another entity or person.

---

[8] The Williams' first interaction with LSC was in August 2015.

14

Pt. 6, § 2, Rules of Supreme Ct. of Va. Here, the LSC client consultants routinely engaged in the unauthorized practice of law, including giving legal advice or counsel for compensation, and lawyers not admitted in the Western District of Virginia selected, drafted, and completed legal documents which affected the legal rights of the debtors in the underlying cases. See also Johnson, 327 F.3d at 561 ("In Illinois, the practice of law includes, at a minimum, representation provided in court proceedings along with any services rendered incident thereto, even if rendered out of court"). The fact that all of this happened in Chicago and not physically within this district is immaterial because it impacted cases in this district.

The court concludes that no matter how you look at it, Chern, Allen, and LSC were engaged in the practice of law in the Western District of Virginia. Further, the bankruptcy court has the inherent authority to suspend or revoke an attorney's ability to appear before them, especially when the court concludes that the attorney acted in bad faith. See Roadway Exp., Inc. v. Piper, 447 U.S. 752, 767 (1980); but see In re Rimsat, 212 F.3d at 1047 (affirming bankruptcy sanctions despite bankruptcy court not explicitly finding bad faith). As such, the bankruptcy court did not err in revoking Chern, Allen, or LSC's authority to practice before the Western District of Virginia for five years.[9]

---

[9] The court also finds that appellants' argument that the sanctions were imposed solely for prelitigation conduct is without merit. While it is true that Chern created the Sperro program before the Scott and Williams' bankruptcies were filed, the Sperro program nevertheless had a direct impact on the underlying bankruptcy cases. Specifically, their cars were towed and sold by Sperro. Bankr. Op. 476, 480. Likewise, examples of the unauthorized practice of law cited by the bankruptcy court also occurred before the underlying bankruptcy cases were filed, yet similar misconduct occurred in the underlying cases, including non-lawyer client consultants advising Mr. Williams to keep his car hidden until the Sperro program could tow it. Bankr. Op. 475.

b. Monetary Sanctions

A court may order a monetary recovery under its inherent authority for bad faith conduct by attorneys. Six, 891 F.3d at 519. In addition to the court's inherent authority, Section 105(a) of the Bankruptcy Code preserves the authority of the court to "sua sponte, tak[e] any action . . . to prevent the abuse of process." For example, federal courts can award opponents attorney's fees as a sanction for bad-faith conduct relying on either their inherent authority or Section 105(a). In re Jemsek Clinic, P.A., 850 F.3d 150, 159 (4th Cir. 2017) (inherent authority); In re Rimsat, Ltd., 212 F.3d at 1048 (inherent authority and Section 105(a)).

Appellants assert several issues resulting from the monetary sanctions that the bankruptcy court imposed: (1) the sanctions violated appellants' due process rights as the fines were excessive; (2) the sanctions violated appellants' due process rights as the appellants had no opportunity to present evidence of their ability to pay; (3) the bankruptcy court exceeded its statutory and inherent authority in imposing the monetary sanctions without specifying future misconduct to be deterred; and (4) the United States Trustee waived any monetary sanction above $5,000.00. The court concludes that the bankruptcy court had the authority to impose monetary sanctions, but the amount of the sanctions imposed in this case was such that appellants should have been given an opportunity to be heard on their ability to pay.

1. Excessive Sanctions

Appellants first argue that the sanctions imposed violated appellants' due process rights because the sanctions were excessive. Appellants rely on State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003), which established three guideposts to determine whether

a punitive sanction award is grossly excessive.[10] The guideposts are: "(1) [t]he degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded . . . and the civil penalties authorized or imposed in comparable cases." Id. Applying these guideposts to the case at bar, the court cannot conclude the sanctions against Chern, Allen, and LSC are excessive.

First, the bankruptcy court concluded that the hard-sell tactics employed by the client consultants, the lack of supervision of the client consultants, including the ability for them to drink beer on the job, the focus on cash flow, the Sperro program, and a litany of other forms of misconduct all amounted to reprehensible and bad-faith conduct. Bankr. Op. at 507. The court concludes that the record established is sufficient to support the bankruptcy court's conclusion that the appellants acted in bad faith.

Second, appellants argue that the bankruptcy court based its monetary sanctions primarily on appellants' past participation in the Sperro scheme. Appellants further contend that they terminated the Sperro program over two years before the bankruptcy court issued its judgment. While the duration of the Sperro scheme might have been short, it does not otherwise absolve the appellants of the misconduct or establish that the bankruptcy court abused its discretion in imposing the sanctions. In fact, Chern admitted that he felt remorse for the Sperro program and that it "was a horrible mistake." Bankr. Op. 504, n. 67. Rather than demonstrate the disparity between the harm and the amount of the sanctions, this

---

[10] As the government properly points out, Campbell set the standard to review punitive damages, and not the court's inherent or statutory authority to issue monetary relief as a sanction. However, the court finds it a worthwhile comparison and will review the monetary sanctions under the Campbell guideposts.

admission supports the bankruptcy court's conclusion that appellants' actions were reprehensible and committed in bad faith.

Appellants also assert that they mitigated any harm by taking self-corrective measures, such as terminating the Sperro program and changing the Sales Play Book. The bankruptcy court concluded that Chern's testimony "was not credible" when he claimed he did it to self-correct. In fact, Chern "decided to terminate" the Sperro program "due to a variety of factors, one of which was Chern learning from one of his limited partners that a lawsuit was filed by Ally Financial against Sperro and others alleging that the appellants in that case were complicit in converting its collateral." Bankr. Op. 473. While it is true that appellants repaid Scott and the Williamses their filing fees, it did not mitigate all the damages cause by appellants' misconduct.[11]

Appellants seek to limit the ability of the bankruptcy court to sanction them beyond the $5,000 sought by the United States Trustee in its complaint. Plainly, the bankruptcy court has authority to impose sanctions above and beyond that sought by the United States Trustee pursuant to Bankruptcy Code § 105(a) based on a sufficient factual record. Here, the bankruptcy court found that "[g]iven LSC's financial resources and revenues in particular, as reflected by its tax returns and evidence of receipts from residents of the Western District of Virginia, these sums are appropriate in an effort to deter future misconduct." Bankr. Op. 55. Given the extreme nature of the misconduct and the fact that LSC earned over $800,000 in fees from residents of the Western District of Virginia, the court cannot conclude that the

---

[11] In footnote 85, the bankruptcy court found that the damage to the Williamses and Scott was due to more than just the filing fee, including that they were "put through much stress, anxiety, and inconvenience in this case, including having to take time to appear for depositions and/or court." Bankr. Op. 513, n. 85.

amount of the sanctions is clear error or an abuse of discretion. See Law Solutions of Chicago, LLC v. Corbett, Case No. 18-cv-677, 2019 WL 1125568 (N.D. Ala. Mar. 12, 2019) (affirming $150,000 sanction against LSC).

2. Ability to Pay

Appellants next assert that the bankruptcy court violated their procedural due process rights by implementing a sanction that was 12 times that requested by the United States Trustee without permitting appellants to present evidence regarding their ability to pay the sanction. While this court need not determine if In re Kunstler, 914 F.2d 505, 524 (4th Cir. 1990) applies outside the context of Fed. R. Civ. P. 11 violations, its analysis is helpful in this context. The Fourth Circuit held that "[w]hen the monetary sanction is large [] the parties should generally be given the opportunity to submit affidavits on their financial status, or to submit such other evidence as the court's discretion permits." Id. Here, the court finds that a $300,000 sanction is significantly large to warrant appellants' need to argue their ability to pay. The bankruptcy court determined that Chern, Allen, and LSC could pay the large sanction only based on Chern and Allen's salaries, LSC's tax returns, and legal fees paid by residents in this district. Bankr. Op. 507. The court concludes that the record established by the bankruptcy court did not sufficiently take into consideration appellants' ability to pay. Accordingly, the court remands to the bankruptcy court for an evidentiary hearing on Chern, Allen, and LSC's ability to pay the monetary sanctions.

3. Deterrence

Appellants argue that the bankruptcy court exceeded its statutory and inherent powers by imposing monetary sanctions without specifying the future misconduct to be deterred. The

bankruptcy court concluded that the sanctions were imposed to "deter future misconduct." Bankr. Op. 507. It is clear from the record the bankruptcy court wanted to deter appellants from continuing the heavy-handed sales tactics employed by the client consultants pursuant the Sales Play Book, entering into another program similar to Sperro, and engaging in litigation misconduct. The court finds that based on this record the imposition of monetary sanctions was not clearly erroneous or an abuse of discretion, but rather was proper as a deterrent for future misconduct.

## IV.

The bankruptcy court imposed a one-year practice revocation and $5,000 sanction and an eighteen-month practice revocation and $5,000 sanction on Delafield and Morgan, respectively. Appellants claim the bankruptcy court erred in imposing the practice revocation and the monetary sanctions for Delafield and Morgan's involvement in LSC's misconduct, including the Sperro program, and their individual failings in the representation of their clients were in error. The court concludes that the bankruptcy court established a record finding that both Delafield and Morgan acted in bad faith and, thus, did not abuse its discretion or engage in clear error by sanctioning Delafield and Morgan. See Six, 891 F.3d at 519.

It is undisputed that the bankruptcy court has the authority to impose the practice revocation on Delafield and Morgan. See In re Evans, 801 F.2d at 706. Moreover, as discussed above, bankruptcy courts have the authority, both pursuant to their inherent power and Section 105(a), to impose sanctions on litigants for bad-faith conduct. See, e.g., Six, 891 F.3d at 519; 11 U.S.C. § 105(a). Because the court reviews the bankruptcy court's determination for an abuse of discretion, the question is if "it has acted arbitrarily or irrationally, has failed to

consider judicially recognized factors constraining its exercise of discretion, or [if] it has relied on erroneous factual or legal premises." Welsh, 879 F.3d at 536.

With respect to Delafield, the bankruptcy court properly acknowledged that he did some things correctly in his representation of the Williamses. Bankr. Op. 508. However, as a partner of LSC, he also is responsible for the shortcomings of the firm. The bankruptcy court found that LSC's attorneys regularly ignored, and to a certain extent, encouraged, the unauthorized practice of law by LSC's sales consultants. The bankruptcy court recognized that Delafield was not a managing partner of LSC but found that was not an excuse for violating the ethical rules.[12] Accordingly, Delafield, is responsible for the acts of the other LSC attorneys. See Va. Rule of Prof. Conduct 5.1(c).[13]

The bankruptcy court also found that Delafield engaged in some misconduct with respect to his representation of the Williamses, including claiming to not know about the Sperro program during the 341 creditors meeting.[14] Id. at 508. In fact, despite Delafield's denial, "he knew full well what the Sperro program was and how it worked." Id. The record

---

[12] Appellants argue that Delafield and Morgan were not part of the firm's management and should not be held responsible for the Sperro program or the rampant unauthorized practice of law at LSC. The court finds this argument disingenuous. Appellants argue Chern, Allen, and LSC are not liable for the misconduct because they were not involved in the cases before the bankruptcy court. Yet, appellants maintain that Delafield and Morgan are also not liable because their involvement was limited to the cases before the bankruptcy court. Therefore, appellants would have the court decide that no party is liable for the bad-faith conduct that the bankruptcy court found.

[13] The Virginia Rule of Professional Conduct 5.1(c) provides: "A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if: (1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or (2) the lawyer is a partner or has managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action."

[14] A 341 creditors meeting is a meeting convened by the United States Trustee of creditors where questions are presented to the debtor, under oath, pertaining to the bankruptcy filing. 11 U.S.C. § 341.

reflects that Delafield "knew about the Sperro program before he met with the Williamses" and the Rule 2016(b) disclosure, that Delafield filed, identified that Sperro would pay the filing fee for the Williamses. Bankr. Op. 509.

With respect to Morgan, the same holds true as to his knowledge and involvement with the unauthorized practice of law at LSC and the use of the Sperro program. However, the bankruptcy court also found that Morgan's individual failings in his representation of Scott required a more severe sanction than Delafield. Specifically, Morgan delegated to his non-lawyer spouse, who was employed as a paralegal in his office, the responsibility to prepare, review, and witness the signatures of his client's petitions. The bankruptcy court found this to be "beyond the pale." Bankr. Op. 512. Morgan "did not review Scott's petition or schedules . . . [and] did not witness Scott sign them." Id. at 479. In fact, "the first time [Morgan] laid eyes on Jessica Scott was at her deposition on June 2, 2017, nearly a year and a half after her case was filed." Id. at 511. Instead, Morgan had his spouse meet with Scott and sent a law partner to the 341 creditors meeting.

Finally, the bankruptcy court relied on both Delafield and Morgan's prior disciplinary records before this court, and others, to determine that a lesser sanction would be ineffective to deter future misconduct. Accordingly, the court concludes the bankruptcy court did not abuse its discretion in imposing the practice revocation or monetary sanctions on Delafield or Morgan.

## V.

With respect to Scanlan, the bankruptcy court found him jointly and severally liable for the sanctions imposed on Chern, Allen, and LSC. Appellants argue that these sanctions should

be vacated for insufficient evidence, and the court agrees. The bankruptcy court held Chern, Allen, Scanlan, and LSC liable for $250,000 of the total sanctions imposed. As described above, Chern, Allen, and LSC were intimately involved in the misconduct that led to the sanctions. However, Scanlan is linked to the misconduct only through his ownership interests in Mighty Legal, LLC, Justiva, LLC, and Royce Marketing, LLC, his leadership of LSC's marketing efforts, and one email sent to Fenner regarding the Sperro program. Id. at 456, 507. These connections are insufficient to find that Scanlan was responsible for any of the misconduct leading to the sanctions. Because the court finds that the record does not support sanctioning Scanlan, the court holds that the bankruptcy court abused its discretion and vacates the monetary sanctions as they apply solely to Scanlan.

## VI.

For the reasons stated above, the court **AFFIRMS** the bankruptcy court's February 12, 2018, order, as amended, in part as it relates to the practice revocation of Chern, Allen, and LSC and the practice revocation and monetary sanctions of Delafield and Morgan, **REMANDS** in part to the bankruptcy court for consideration of the ability of Chern, Allen, and LSC to pay the monetary sanctions imposed against them, and **VACATES** in part the sanction as it relates to Scanlan. A corresponding Order consistent with this Memorandum Opinion will be entered this day.

It is so **ORDERED**.

Entered:  12/11/19

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge